IN THE UNITED STATES DISTRICT COURT
FOR THE EASTER DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| KITBAR ENTERPRISES, LLC )<br>)<br>And )<br>)<br>O'HAGAN MEYER, PLLC )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>LIBERTY INSURANCE )<br>UNDERWRITERS, INC. )<br>Serve: Corporation Service Company )<br>      Registered Agent )<br>      1111 East Main Street, 16th Floor )<br>      Richmond, VA 23219 )<br>)<br>Defendant. ) | Civil Action No. 3:17-cv-370-JAG |

## COMPLAINT

Plaintiffs, KitBar Enterprises, LLC ("KitBar") and O'Hagan Meyer, PLLC ("O'Hagan Meyer") by and through counsel, state as follows for their Complaint against Liberty Insurance Underwriters, Inc. ("Liberty"):

## PARTIES

1.  KitBar is a Virginia limited liability company with its principal place of business located in Fairfax, Virginia. KitBar's members are Trilogy, LLC and The Jacqueline L. Danker Revocable Trust (the "Revocable Trust"). Jacqueline Danker is the trustee and sole beneficiary of the Revocable Trust, and she is a United States citizen domiciled in North Carolina. Trilogy's members are (i) Benjamin J. Stone, III ("Stone"), who is a United States citizen domiciled in Virginia; (ii) Paul Dirorio, who is a United States Citizen domiciled in Virginia; and (iii) Southbridge Capital, LLC ("SouthBridge"). William Bessette ("Bessette") owns 100% of

SouthBridge's membership interests. Bessette is a United States Citizen who is domiciled in Virginia.

2. O'Hagan Meyer is a professional limited liability company that maintains its headquarters and principal place of business in Richmond, Virginia. Its members are Charles Meyer and Kevin O'Hagan, both of whom are United States citizens domiciled in Virginia.

3. Liberty is a corporation organized under Illinois law and Liberty has its principal place of business located in Boston, Massachusetts.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different states.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claim occurred in this District.

6. Plaintiffs are properly joined in this action under Rule 20 of the Federal Rules of Civil Procedure because they assert the right to relief jointly with respect to or arising out of the same transaction or occurrence giving rise to the claims and there are questions of law and fact common to all Plaintiffs.

## FACTS PERTINENT TO THE CLAIMS

7. Liberty insured KitBar, pursuant to the Liberty Private Advantage Policy, with Policy No. PCCB-00173858-01, and having a policy period 06/13/2015 through 06/13/2016 ("Policy"). The Policy contained the following Coverage Parts: A. Directors, Officers and Company Liability; and B. Employment Practices Liability.

8. KitBar is a named "Insured" under the Policy.

9. Bessette and Stone are both "Insured Persons," under the Policy. Collectively, KitBar, Bessette and Stone will be referred to as the "Insureds."

10. In early December 2015, the Insureds were served with a complaint (the "Barry Complaint") filed by Jack Barry ("Barry"), in the Circuit Court of Fairfax County, Virginia (the "Barry Lawsuit"). The Barry Complaint named the Insureds as defendants, along with 5Stones Holdings, LLC ("5Stones"), Southbridge Capital, LLC ("SouthBridge"), and The Do Good Things Foundation ("Foundation"). The Insureds provided Liberty with a copy of the Barry Complaint.

11. Barry is a former member of 5Stones Holdings.

12. Following receipt of the Barry Complaint, Liberty insisted that the Insureds use its appointed counsel to defend the claims brought against them. The Insureds had previously worked with JP Sherry of JPS Law, PLLC, and wished to use his firm to represent them and the other parties to the Barry Lawsuit.

13. Nevertheless, Liberty appointed LeClairRyan, P.C. and Charles Sims, Esquire, as lead counsel. 5Stones and Southbridge Capital retained Mr. Sherry to represent their interests.

14. Absent Liberty's decision to provide a defense to the its Insureds following receipt of the Barry Complaint, all defendants in the Barry Lawsuit would have retained Mr. Sherry to represent their interests to avoid the cost of having two separate counsel. There was no conflict between 5Stones and Southbridge Capital, on the one hand, and the Insureds, on the other hand, that required retention of separate counsel.

15. On January 15, 2016, the Insureds' appointed counsel wrote Mr. Auerbach, claims officer for Liberty, confirming Liberty's retention of LeClairRyan on behalf of the Insureds.

16. In compliance with Liberty's attorney guidelines, appointed counsel also provided Liberty with its first case status report dated February 17, 2016. The status report gave Liberty an overview of the parties and the claims asserted by Barry in his Complaint. Liberty did not raise any issue or concern with coverage. Appointed counsel kept Liberty apprised of events occurring in the case through the filing of a demurrer and the commencement of discovery.

17. During the summer of 2016, appointed counsel participated in a conference call with Liberty's claims officer handling the case, where counsel sought and obtained permission to retain a valuation expert, Robert Reilly of Williamette Management Associates, located in Chicago, Illinois. Liberty approved his retention at a rate of $600 per hour. The engagement letter with Mr. Reilly's firm provided that while counsel "had retained" Mr. Reilly, he agreed "that the KitBar Defendants, or their insurer, shall be responsible for payment of Expert's fees and expenses."

18. When Mr. Reilly was engaged, Liberty had not indicated to KitBar that it was reserving the right to deny coverage or to rescind the Policy. While Mr. Reilly is an excellent valuation expert, KitBar would not have agreed to his retention if Liberty had indicated it was reserving the right to rescind the policy or deny coverage for defense costs. Instead, KitBar would have insisted on retaining a local valuation expert at a lower rate.

19. In August, lead defense counsel for the Insureds joined O'Hagan Meyer. After the Insureds consented to the transfer of their representation to O'Hagan Meyer, Liberty engaged O'Hagan Meyer to continue the defense of the Barry Lawsuit on behalf of its Insureds. Mr. Sims continued to serve as lead counsel and continued to regularly report to Liberty in compliance with the terms of Liberty's attorney guidelines.

20. Indeed, throughout the defense of the Barry Lawsuit in 2016, defense counsel appointed by Liberty sought and obtained Liberty's approval for (i) the retention of outside vendors to handle and process e-discovery; (ii) appearance of more than one lawyer at client meetings; (iii) research of legal issue; and (iv) the retention of experts, among other things.

21. On October 5, 2016, appointed counsel provided Liberty with an updated status report, and in so doing, discussed the allegations made by Barry in his amended complaint, and the procedural status of the case. Appointed counsel also provided Liberty with an updated analysis of the case.

22. On October 7, 2016, KitBar received a letter from Liberty regarding its "preliminary analysis with respect to …. submission" of the claim (the "October 7, 2016 Letter"). The October 7, 2016 Letter from Liberty is attached as Exhibit 1. Liberty's October 7, 2016 Letter acknowledged receipt of the original Barry Complaint, and its submission to Liberty for coverage under the Policy. The October 7, 2016 Letter also acknowledged that Barry had amended his complaint in April 2016, after the court had sustained certain of the defendants' demurrers.

23. Liberty's October 7, 2016 Letter states that Liberty has "reviewed and considered the provisions of the Policy, in light of the materials and the information we have received to date." It also states: "Liberty recognizes that the allegations are entirely unsubstantiated and nothing contained in this Complaint [sic] is intended to imply that Liberty believes the allegations have any factual or legal merit whatsoever."

24. The October 7, 2016 Letter also summarized the allegations Barry made against the Insureds in the Barry Complaint.

25. Liberty acknowledged in its October 7, 2016 Letter that "[a]s the named insured, KitBar is a covered Insured for this matter," but neither 5Stones, Southbridge Capital, nor Do Good Things Foundation are insureds under the Policy. The Letter goes on to state that Liberty considers Bessette and Stone Insured Persons under the Policy with respect to allegations against them in their roles as officers of KitBar, but not in their roles as officers of 5Stones.

26. Liberty further noted in its letter that:

Liberty has the right and duty to defend a Covered Claim, which includes the right to appoint defense counsel. Liberty has appointed attorney Charles Sims at the O'Hagan Meyer law firm (formerly at the LeClairRyan law firm) to represent KitBar, [Mr. Bessette] and Mr. Stone in this matter at the negotiated rates . . ., subject to conformance with Liberty's Litigation Guidelines.

27. Liberty's October 7, 2016 Letter directed the Insureds to "not incur any **Defense Costs**, admit any liability, assume any obligation, agree to any settlement, or make any settlement offer with respect to any **Claim** without the Insurer's prior written consent, which shall not be unreasonably withheld." (emphasis in original).

28. Liberty's October 7, 2016 Letter declared that Liberty's decision to provide a defense of the clams against KitBar, Bessette and Stone was "based on the documentation submitted to date and currently known facts and *allegations*." (emphasis added).

29. Shortly after sending the October 7, 2016 Letter, Mr. Weisman assumed responsibility for the case at Liberty.

30. The defendants to the Barry Lawsuit, including the Insureds, began to explore the possibility of settlement with Barry in order to minimize costs and reduce the risk of any adverse judgment.

31. As directed by Liberty in its Policy and in the October 7, 2016 Letter, the Insureds, through counsel, expressed to Liberty their desire to attempt settlement discussions

with Barry and awaited authorization from Liberty to propose terms. Liberty never gave the Insureds authority to propose terms for settlement.

32. In connection with the Insureds' effort to explore settlement discussions, Mr. Weisman requested that O'Hagan Meyer provide Liberty with an assessment of the Insureds' potential exposure in the case. O'Hagan Meyer provided Mr. Weisman with its assessment by letter dated November 3, 2016.

33. Following receipt of O'Hagan Meyer's assessment, Mr. Weisman requested that O'Hagan Meyer provide him with a general timeline for the trial schedule, steps to prepare for trial, an estimate of associated fees, and settlement proposal/strategy, which was provided on December 6, 2016.

34. On December 19, 2016, Mr. Weisman, on behalf of Liberty, approved retention of an investigator to locate what was deemed at the time to be a critical witness located in Florida who was associated with Rapid USA. Later, on January 9, 2017, Mr. Weisman approved the retention of Harold Martin at Keiter Stephens as an expert to rebut the testimony of Plaintiff's expert.

35. On January 12, 2017, without any prior notice, R. Stacy Lane of Bailey Cavalieri, wrote KitBar on behalf of Liberty informing the Insureds that Liberty was denying coverage under the Policy (the "January 12, 2017 Letter"). The January 12, 2017 Letter is attached as Exhibit 2.

36. Relying solely on allegations in Barry's original complaint, Liberty asserted that it was entitled to deny coverage because KitBar's application for coverage submitted on June 13, 2015 allegedly contained "false statements/non-disclosures."

37. In its January 12, 2017 Letter, Liberty also asserted that under Section IV.2 of the D&O Coverage Part of the Policy, the Policy excluded any claim "based upon, arising out of, or attributable to any written demand or proceeding against any Insured which was made or pending on or before the applicable Prior Litigation Date set forth in the Coverage Schedule in Item IV(B) of the Declaration, or the same or substantially the same fact, circumstance, or situation underlying or alleged therein."

38. Liberty's position in the January 12, 2017 Letter, which accepted as true the allegations in the Barry Complaint, contradicted its position just three months earlier in the October 7, 2016 Letter, where Liberty acknowledged the allegations were "entirely unsubstantiated." Indeed, the very allegations from the Barry Complaint that Liberty relied on to deny coverage in its January 12, 2017 Letter were summarized in Liberty's October 7, 2016 Letter, and were known to Liberty in December 2015 when it received the Barry Complaint.

39. Liberty's January 12, 2017 Letter stated that while Liberty did not believe "it is responsible for any Defense Costs incurred since the Claim was first made against the Insureds," Liberty's counsel, however, wrote that Liberty would honor its obligation to pay "the reasonable and necessary Defense Costs incurred up to the date of [the] letter subject to a full reservation of Liberty's right to recoup such amount any other amounts paid by Liberty under the Policy . . ."

40. This position was later reiterated by Mr. Weisman to O'Hagan Meyer over the telephone. Upon receipt of the January 12, 2017 letter, the Insureds had to scramble to obtain funds to pay their experts to complete their reports, which were due in eight days, and they cancelled the depositions of the Rapid USA witnesses in Florida for lack of funds.

41. Notwithstanding that Liberty had represented in its January 12, 2017 Letter it would pay defense costs through the date of its letter, Liberty did not pay those fees or costs. By

Case 3:17-cv-00370-JAG   Document 1   Filed 05/12/17   Page 9 of 20 PageID# 9

letter dated March 6, 2017, Liberty's new counsel, Edward Cameron of Cameron McEvoy, wrote KitBar and its outside counsel that Liberty would not make any further payments for defense costs pertaining to the litigation, even those incurred before the January 12, 2017 Letter. This letter came just days before the case was set for trial on March 20, 2017. The March 6, 2017 Letter is attached as Exhibit 3.

42. By letter dated March 10, 2017, O'Hagan Meyer contested Liberty's decision not to pay the fees and costs incurred by O'Hagan Meyer before January 12, 2017, because Liberty retained O'Hagan Meyer to defend its Insured. O'Hagan Meyer's March 10, 2017 Letter, without attachments, is attached as Exhibit 4. Notwithstanding that O'Hagan Meyer sought a response to its letter by March 29, 2017, no response has been received.

43. The underlying case between Barry and the Insureds was tried to the Honorable Judge Tran of the Circuit Court for the County of Fairfax, Virginia, commencing March 20, 2017. After a four-day trial, the Court issued preliminary findings in favor of the defendants on all of Barry's claims, stating on the record: "And for those reasons, I would enter judgment in favor of the defendants on the complaint…" The parties to the Barry Lawsuit subsequently agreed to a dismissal of the case with prejudice, with each side bearing their defense costs.

44. The decision to deny coverage just weeks before the KitBar Parties were to submit their expert reports and less than two months before trial was wrongful and clearly in bad faith.

## COUNT I
## **BREACH OF CONTRACT**
## (KITBAR v. LIBERTY)

45. KitBar incorporates all allegations in the Complaint.

46. KitBar and Liberty are parties to an insurance contract described above as the Policy.

47. KitBar complied with the terms of the Policy and paid all premiums when due.

**Bessette Answered the Questions in the Application to the Best of His Knowledge and Belief.**

48. Bessette answered the questions in the application for the Policy truthfully and accurately.

49. Liberty breached the Policy when it wrongfully attempted to rescind the Policy and stopped paying for defense costs incurred by the Insureds in the defense of the Barry Lawsuit.

50. Liberty's basis for denying coverage and rescinding the Policy was unfounded. Indeed, notwithstanding that Endorsement No. 1 to the Policy provides that the Insureds agree to provide Liberty with "all information, assistance, and cooperation which the Insurer reasonably requests," Liberty never sought any information from KitBar to determine the facts before attempting to rescind the Policy and declining coverage just weeks before expert disclosures were due and two months before trial.

51. Bessette certified that the answers he gave in the application for the Policy was true to "the best of [his] knowledge and belief." Under well-established Virginia law, to support rescission of the Policy, Liberty must establish that Bessette's answers were "'knowingly false'" when it abruptly decided to rescind the Policy in January 2017.

52. Had Liberty sought information, it would have found that Bessette did not knowingly provide false answers to the questions in the application.

53. Liberty's January 12, 2017 Letter falls woefully short of meeting that legal threshold, because Liberty relied solely on the allegations in the Barry Complaint to substantiate

its decision to deny coverage because of fraud, as outlined at page 3 of its January 12, 2017 letter. Liberty conceded just months before that the allegations in the Barry Complaint were "entirely unsubstantiated." Indeed, none of the allegations in Barry's Complaint establish that there was a written demand made by Barry against KitBar or any of its officers for money damages before June 13, 2015, which is the date of the application. Plainly, there is no allegation that Barry had commenced a civil proceeding against KitBar or its officers. There was no (1) arbitration, (2) criminal proceeding, (3) administrative or regulatory proceeding, (4) administrative or regulatory investigation, nor was there (5) a derivative demand against KitBar or its officers as of June 13, 2015.

54. There is no allegation within the four corners of the Barry Complaint that establishes Barry had provided the Insureds with written notice of a claim against KitBar or its officers and managers before the application was completed. The unsubstantiated allegations in the Barry Complaint plainly do not establish a factual basis to establish that Bessette was on notice that Barry would assert a claim for money damages against KitBar or its officers and managers as of the date of the application.

55. Indeed, as of June 13, 2015 when he completed the application, Bessette had no knowledge of any facts that he believed would reasonably be expected to give rise to a written demand against KitBar for money damages or other relief.

**Liberty Was on Notice of Barry's Threatened Claims Against 5Stones**

56. HRI Associates is the statutory agent of Liberty pursuant to Va. Code § 38.2-1801 because it solicited, or negotiated, or sold the Policy to KitBar.

57. As the statutory agent of Liberty, HRI's knowledge is imputed to Liberty.

11

58. HRI had been providing insurance related services to 5Stones for several years before Southbridge Capital and Stone made the decision to cease 5Stones' operations and sell its assets to KitBar in October 2015. HRI knew that 5Stones was a holding company that owned companies that operated restaurants employing the KitBar concept.

59. HRI was also aware that Barry was a former member of 5Stones, and it was aware as of July 2014 that Barry's relationship and membership interest in 5Stones had been terminated. HRI was told that 5Stones had recently learned that Barry had consented to a judgment against him by the Securities and Exchange Commission ("SEC") and that he had not disclosed that information to Stone before becoming a member of 5Stones and being appointed 5Stones' Developmental Partner in the company's operating agreement.

60. By email dated September 11, 2014, Bessette asked HRI's president, Doug Downer to send 5Stones' insurance policies to 5Stones' lawyer, Wayne Lee, who was copied on the email. Bessette wrote: "We have been threatened on a possible lawsuit?"

61. Downer responded to Bessette's email stating that there was no D&O policy in place for 5Stones.

62. Later that date HRI provided Bessette with an application for D&O and EPL coverage for 5Stones.

63. Later in October 2014, HRI wrote an email stating: "Doug [Downer] has advised that 5Stones is being purchased by Kitbar [sic] Enterprises, as the new holding company for all the entities." HRI was told via email that "KitBar Enterprises, LLC has been created," and that 5Stones was ceasing business.

64. Subsequently, HRI was provided financial statements for KitBar' operating restaurants and ownership information, which showed that KitBar owned the operating companies previously owned by 5Stones.

65. After an unsuccessful attempt to place D&O insurance with Travelers, HRI transmitted to KitBar a quote from Liberty for D&O and EPL coverage on January 9, 2015. As of the date the Liberty quote was presented to KitBar, KitBar had not completed an application for insurance with Liberty.

66. HRI sent KitBar an email dated April 21, 2015, which contained an application for D&O and EPL coverage with Liberty and which contained a spreadsheet depicting the ownership changes for 5Stones, KitBar, and the operating entities.

67. Accordingly, when the Policy was issued on June 13, 2015, through its agent, HRI, Liberty had knowledge that: (i) Barry's membership in 5Stones was terminated as of July 2014; (ii) Barry had threatened litigation against 5Stones; (iii) following that threat, KitBar was created and 5Stones transferred its assets, which were the operating restaurants, to KitBar. These are the basic allegations that Liberty relies upon in its January 12, 2017 Letter to wrongfully rescind the Policy.

**Liberty's Reliance on an Exclusion in the Policy as a basis for Rescission is Meritless**

68. In the January 12, 2017 letter, Liberty also asserts that "Section IV.2 of the D&O Coverage Part provides that Liberty shall not be liable under any Insuring Clause of this Coverage Part for Loss on account of any claim made against any Insured based upon, arising out of, or attributable to any written demand or proceeding against any Insured which was made or pending on or before the applicable Prior Litigation Date set forth in the Coverage Schedule,

or the same or substantially the same fact, circumstance or situation underlying or alleged therein (June 13, 2015)."

69. This language is an exclusion – and was not part of the Application. The exclusion does not apply because no claim had been made against KitBar as of the application date.

**Liberty Breached its duty to KitBar to Provide a Defense**

70. Under Endorsement 1 to the Policy, Liberty had the "duty" to "defend any "**Claim**, other than a **Pollution Claim**, even if such **Claim** is groundless, false or fraudulent."

71. Liberty's duty to defend is broader than its obligation to pay. The obligation to defend arises whenever the complaint against the insured alleges facts and circumstances, of which, if proved would fall within the risk covered by the policy.

72. The allegations in the Barry Complaint gave rise to a duty on the part of Liberty to provide a defense for its Insureds. Liberty provided the Insureds a defense to the claim asserted against in the Barry Lawsuit until January 12, 2017, when it wrongfully rescinded the Policy and withdrew its defense of the claim.

73. When Liberty withdrew its defense of its Insureds on January 12, 2017, Liberty materially breached the Policy.

**Liberty Waived its Right, if any existed, to Rescind the Policy**

74. Liberty waived its right to rescind the Policy based on the answers in the application.

75. By its January 12, 2017 Letter, Liberty purported to rescind the Policy based solely on the allegations in the Barry Complaint, which Liberty had in its possession for over a year.

14

76. Liberty had knowledge of the alleged basis for rescission for over a year and never provided KitBar with notice that Liberty was reserving a right to rescind the Policy based on Bessette's answers in the application.

77. To effectively reserve its rights to rescind the Policy, Liberty had an obligation to timely communicate its reservation of rights to the Insureds, and in so doing fairly inform the Insureds of Liberty's position so that they could protect their interests.

78. Liberty never gave the Insureds notice that it was reserving its right to rescind the policy based on allegedly false answers in the application for insurance.

79. Liberty's October 7, 2016 Letter did not timely or effectively inform the Insureds that Liberty was continuing to defend the claims against the Insureds while reserving its right to rescind the Policy based on the allegedly false answers to certain questions in the application.

80. To the contrary, the October 7, 2016 Letter made clear that Liberty believed (i) the allegations in the Barry Complaint were unfounded; (ii) Liberty had a duty to defend the claim; and (iii) Liberty had appointed O'Hagan Meyer to defend the claim against its Insureds.

81. Furthermore, Virginia law is clear: an insurer may not exercise the right to rescind the policy if after discovery or knowledge of facts which would entitle a party to rescind, the insurer treats the contract as a subsisting obligation and leads its insureds to believe that the contract is still in effect.

82. The January 12, 2017 Letter establishes that Liberty was on notice of the basis for rescission when it received the Barry Complaint, because without conducting any further investigation, it relied solely on the allegations in Barry's Complaint, which it had in its possession for over a year, as the sole basis for rescinding the Policy.

83. As of the October 7, 2016 Letter, Liberty had knowledge of the allegations in the Barry Complaint for nearly a year, and as shown above, had knowledge of the pertinent facts through its agent, HRI, for nearly a year before it issued the Policy.

84. The October 7, 2016 Letter summarizes the allegations in the Barry Complaint; addresses the pertinent Policy provisions; and provides the Insureds with Liberty's coverage analysis. As part of its coverage analysis, Liberty made clear that it was providing KitBar, Stone and Bessette a defense as its insureds under the Policy, but only with respect to "allegations against [them] in [their] respective capacities. As such, i.e., not for any allegations against [Bessette] and/or Mr. Stone in your roles as [previous] directors or officers of 5Stones."

85. The October 7, 2016 Letter further states as part of its coverage analysis that Liberty has the right and duty to appoint defense counsel, which it had done. The Letter then instructed the Insureds not to incur any defense costs, or settle the case without Liberty's approval.

86. The October 7, 2016 Letter did not raise any issues with the application, nor did it even mention that Liberty reserved the right to rescind the Policy on the basis of allegedly false answers in the application.

87. Because Liberty's January 12, 2017 Letter unequivocally predicates its justification for rescinding the Policy on the Barry Complaint, Liberty was on notice of the alleged grounds for rescission since December 2015, if not when Liberty issued the Policy in June 2015. Yet, rather than rescind the Policy, Liberty treated the Policy as being in force and hired defense counsel, paid defense experts, required compliance with its guidelines and approved the retention of experts. In short, Liberty failed to act within a reasonable time to rescind the policy, and thus, it waived that right long before January 12, 2017.

**Liberty is Estopped from Rescinding the Policy**

88. Liberty is also estopped from rescinding the Policy. Under Virginia law, estoppel precludes an insurer who has knowledge of the facts giving rise to a right to rescind the policy from doing so after assuming an inconsistent position to the prejudice of the insured who has been led to rely upon the insurer's first position. Liberty acquired knowledge of the allegations in the Barry Complaint in December 2015 (and it had knowledge through its statutory agent HIR since September 2014), which were sufficient to put a reasonably prudent person on inquiry notice; yet it did nothing to assert its alleged rights to rescind the Policy until 13 months later, at the extreme prejudice of its Insureds.

89. The January 12, 2017 Letter is dispositive of the knowledge issue, because Liberty relies exclusively on the allegations of the Barry Complaint, which Liberty received over a year before rescinding the Policy.

90. In reliance on Liberty's actions for well over a year, the Insureds (1) utilized Liberty's appointed counsel while also having affiliated parties represented by another counsel; (2) retained an expert located in Chicago, Illinoi at $600 per hour; (3) incurred legal fees and expenses in having to provide reports and status updates to Liberty; (4) obtained Liberty's permission to incur any substantial defense cost; and (5) deferred attempts to settle until obtaining Liberty's consent, which was never forthcoming, just to name a few.

91. The Insureds also did not explore settlement options earlier with Barry because they believed in the merits of their defense and believed, based on Liberty's representations, that Liberty would provide them a defense of Barry's claims. Had the Insureds known Liberty would not be providing a defense under the Policy, the Insureds would have explored settlement earlier

before incurring nearly $400,000 in legal fees and costs associated with trying the case to verdict.

92. Liberty's conduct, as described above, breaches the implied covenant of good faith and fair dealing.

93. Because of Liberty's breach of its duties to the Insureds, KitBar has suffered damages in amount to be proven at trial but expected to exceed $200,000.

## COUNT II
## BREACH OF CONTRACT
## (O'HAGAN MEYER v. LIBERTY)

94. O'Hagan Meyer incorporates by reference all allegations in the Complaint.

95. As acknowledged by Liberty in its October 7, 2016 Letter, Liberty appointed O'Hagan Meyer to represent its Insureds in connection with the claims made by Barry in the Barry Lawsuit.

96. In accepting the engagement, O'Hagan Meyer agreed to reduced rates and to comply with Liberty's guidelines and billing procedures.

97. Because Liberty engaged O'Hagan Meyer to provide a defense for its Insureds, O'Hagan Meyer relied upon Liberty's financial condition – not its insureds – for the payment of its fees. In reliance on its appointment by Liberty, O'Hagan Meyer did not seek or obtain retainers from the Insureds to cover the contingency that Liberty might belatedly decide to decline coverage or rescind the Policy after O'Hagan Meyer has committed substantial resources, expenses, and time in defending the Insureds' rights.

98. O'Hagan Meyer performed legal services for the Insureds on behalf of and at the request of Liberty.

18

99. Liberty agreed to pay for those services until it wrongfully attempted to rescind the Policy and decline coverage.

100. As of January 12, 2017, O'Hagan Meyer had incurred fees and expenses in the defense of Liberty's Insureds in the amount of $86,940.70.

101. Despite demand for payment, and despite having represented in the January 12, 2017 Letter, and orally over the phone that Liberty would pay the fees and expenses incurred before January 12, 2017, Liberty has not paid and is refusing to pay O'Hagan Meyer the amounts it incurred in representing its Insureds.

102. In so doing, Liberty has breached its contract with O'Hagan Meyer, which has caused O'Hagan Meyer to incur damages in excess of $87,000.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully request that judgement be entered in their favor and against Defendant as follows:

1. As to Count I, judgment in favor of KitBar against Liberty for Breach of Contract in an amount to be determined at trial, but not expected to be less than $200,000;

2. Pre-judgement and post-judgment interest;

3. As to Count I, judgment in favor of O'Hagan Meyer against Liberty for Breach of Contract in an amount to be determined at trial, but not expected to be less than $86,940.70;

4. Prejudgment and post-judgment interest; and

5. Such other relief as the Court deems necessary and proper.

KitBar requests that the Court retain jurisdiction after entering judgment in its favor for Breach of Contract against Liberty so that it may pursue its attorneys' fees and costs under Va. Code § 38.2-209(A) for Liberty's bad faith refusal to provide a defense under the Policy.

## JURY DEMAND

Plaintiffs demand a trial by jury as to all Counts in the Complaint.

Dated: May 12, 2017

Respectfully submitted,

**O'HAGAN MEYER, PLLC
AND KITBAR ENTERPRISES, LLC**

_____
Charles M. Sims (VA Bar # 35845)
H. Robert Yates, III, Esquire (VA Bar # 35617)
O'Hagan Meyer, PLLC
411 East Franklin Street, Suite 500
Richmond, Virginia 23219
Tel: (804) 403-7100
Fax: (804) 237-0250
CSims@ohaganmeyer.com
RYates@ohaganmeyer.com

*Counsel for Plaintiffs*